## JOHN HENRY PRATHER v. STATE.

No. A-3135. Opinion Filed March 2, 1918.

(170 Pac. 1176.)

1. **WITNESSES—Cross-Examination of Accused—Scope.** On a trial for murder committed by an inmate of the state penitentiary, where the defendant, testifying in his own behalf, volunteered the statement that he was serving a life term, it was competent on cross-examination to show the nature of the crime for which he was then serving such term.

2. **EVIDENCE—Matters of Mitigation or Aggravation—Statute.** Where the jury assesses the punishment, matters to be considered in mitigation or aggravation of the punishment may be properly received in evidence on the trial.

3. **TRIAL—Argument—Inference.** The county attorney in argument may draw all proper inferences which are deducible from the relevant and competent evidence admitted.

4. **APPEAL AND ERROR—Sufficiency of Evidence—Inferences.** On the question of whether there is sufficient evidence to support a verdict, the court must treat as duly established all facts warranted by the testimony of the witnesses for the state, and give the prevailing side the benefit of every favorable inference fairly and legitimately deducible from those facts.

*Appeal from District Court, Pittsburg County;*
*R. P. deGraffenried, Assigned Judge.*

John Henry Prather was convicted of murder, and sentenced to death, and he appeals.

This is an appeal from the district court of Pittsburg county, wherein one John Henry Prather was convicted of the crime of murder and sentenced to death. The deceased, Charles Chapman, alias Charles Ross, and Prather were cell-mates in the penitentiary located at McAlester. Their cell was number 60 in the third tier in the negro cell house. On the occasion of this difficulty, Prather had returned from work and was in the cell when Ross re-

turned from his work between 7 and 7:30 in the evening. The evidence on the part of the state shows that as soon as Ross started to enter the cell Prather stabbed him with a dirk knife, which apparently had been made out of one of the steel case knives used in the dining hall at the penitentiary. The wound penetrated the abdomen, and the interior of the wound was larger than the point of entrance, showing that after the knife had been stuck into the body of the deceased, the defendant had apparently twisted it around. The wound was one ordinarily considered fatal. The deceased lived two or three days after being stabbed, and died at the hospital in the penitentiary.

According to the witnesses for the state, very little was said by either party at the time of this difficulty. The nearest occupants of cells heard no scuffle or noise of any kind prior to the stabbing, testifying that apparently immediately after Ross started into the cell, he backed out with the remark to Prather, "Are you going crazy? You ought to be ashamed of yourself."

The deceased made a dying statement to the warden of the penitentiary in which he stated that he and Prather had had no serious difficulty, but that a few days before this cutting Prather had intimated to him that he intended to kill one Boyd, who was then one of the yard guards at the penitentiary. Ross, the deceased, said he remonstrated with Prather, and attempted to get him to refrain from any such conduct as that, advising him it would be best to have a good prison record. Ross stated that after that occurrence Prather seemed to be incensed, and that he knew of no other reason why he should kill him or stab him. Prather's defense was that he stabbed Ross in order to protect himself from an assault about to

be committed by Ross with a knife. He claims that Ross had threatened to kill him for revenge, because some other negro about the color of Prather had previously murdered his brother. When the deceased was taken to the hospital immediately after the stabbing, no weapon of any kind was found upon his person. The knife used by the defendant was found concealed in the toilet in the cell. The defendant at the time of this occurrence was serving a life term for murder. The deceased was serving a 16-year term for assault with intent to kill. ...

*Cad Mathis,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above). It is first contended that the court erred in permitting the county attorney, over the objection and exception of counsel for defendant, in the cross-examination of the defendant, to ask him concerning a former conviction for murder committed in Oklahoma county. The record on this assignment is as follows:

"Q. Charley Ross just had 10 or 15 years ahead of him, didn't he? A. Sir? Q. Charley Ross wasn't a lifer? A. No, sir; doing 16 years. Q. You said a while ago you were in there for life? A. Yes, sir. Q. For killing a white man in Oklahoma county?

"Mr. Mathis: Object.

"The Court: You have a right to show he was convicted.

"Mr. Mathis: Yes, sir; but not the circumstances.

"The Court: Q. You were charged with and convicted of murder? A. Yes, sir.

"The County Attorney: Q. In Oklahoma county? A. Yes, sir. Q. You were sentenced to be hung?

"Mr. Mathis: Object to that as incompetent, irrelevant, and immaterial, and doesn't tend to prove any issue in this case.

"The Court: I think he can ask him if he was convicted for murder and sent to the penitentiary for life.

"The Court: What was your sentence? A. I was sentenced to death.

"The County Attorney: Q. That was afterwards commuted, was it?

"Mr. Mathis: I except to all of that, and ask that it be stricken from the record.

"The Court: All of which?

"Mr. Mathis: About his being sentenced to death and about it being commuted.

"The Court: Overruled, because that is what the sentence of the court was.

"The County Attorney: Q. You say your sentence was commuted to life? A. Yes, sir."

It will be noticed that on his direct examination the defendant, in detailing the facts and circumstances surrounding the difficulty with the deceased which ended in this fatal stabbing, testified to the effect that he had a life sentence in the penitentiary, and had no way to get pardoned or paroled. It was certainly competent, therefore, on the part of the state to cross-examine him upon any subject which he had detailed in his direct examination, and, having volunteered the statement that he was a life-termer in the penitentiary, it became competent for the state on cross-examination to inquire into the nature of the crime for which he had been previously convicted and sentenced. It has been repeatedly held by this court that

such is a proper inquiry to affect the credibility of any witness, including a defendant. *McDaniel v. State,* 8 Okla. Cr. 209, 127 Pac. 358; *Slater v. U. S.,* 1 Okla. Cr. 275, 98 Pac. 110; *White v. State,* 4 Okla. Cr. 143, 111 Pac. 1010; *Fowler v. State,* 8 Okla. Cr. 130, 126 Pac. 831; *Manning v. State,* 7 Okla. Cr. 367, 123 Pac. 1029.

But we believe it was also competent in this case to establish the status of the defendant as a prisoner in the penitentiary. If he was then serving a term of life imprisonment, it would be no punishment for him for the jury to assess another penalty of life imprisonment, or any other punishment less than death. Section 2319, Rev. Laws 1910, is as follows:

"Any person convicted of murder shall suffer death, or imprisonment at hard labor in the state penitentiary for life, at the discretion of the jury. Upon trial of an indictment for murder, the jury, if they find the defendant guilty, must designate in their verdict whether he shall be punished by death or imprisonment for life at hard labor, and the judgment of the court shall be in accordance therewith. But upon a plea of guilty the court shall determine the same."

Section 5954, *Id.,* provides:

"After a plea or verdict of guilty in a case where the extent of the punishment is left with the court, the court, upon the suggestion of either party that there are circumstances which may be properly taken into view, either in aggravation or mitigation of the punishment, may in its discretion hear the same summarily at a specified time and upon such notice to the adverse party as it may direct."

It is apparent from the foregoing provisions of our statutes that the punishment for murder is either death or imprisonment in the state penitentiary at hard labor for life. Where the defendant stands trial, it is necessary

for the jury to designate in the verdict, if that be one of guilty, what the punishment shall be, and the judgment of the court must be in accordance therewith. It is equally apparent that, if the defendant pleads guilty, the court must pass sentence, and may, before rendering judgment, examine into the circumstances surrounding the killing and inquire into any proper matter which tends either to aggravate or to mitigate the punishment that should be inflicted. The only necessity for the provisions of section 5954, *supra*, is that upon a plea of guilty ordinarily no testimony is heard, and therefore without such statute the court would be left wholly ignorant of the circumstances of the crime, while on the other hand, upon a trial, matters in aggravation or mitigation of the punishment may be properly developed. In *Walburn v. Territory*, 9 Okla. 23, in the body of the opinion at page 29, 59 Pac. 972, 974, the territorial Supreme Court, speaking through Burford, C. J., said:

"Where the jury assesses the punishment on verdict of guilty, it is proper to admit evidence which goes only in mitigation or aggravation."

Some states have gone so far as to pass statutes that the punishment shall be death where a person is convicted of murder with a life penalty in force against him. In the absence of such a statute, however, there can be no doubt that inquiry as to the status of a person imprisoned in the state penitentiary who commits murder while so imprisoned is a proper subject of inquiry by the jury upon a trial therefor, in order to determine what degree of punishment should be inflicted in the event said defendant is found guilty of such crime. Under the provisions of section 2319, *supra*, the jury was required to assess the pun-

ishment in this case. Therefore it is the opinion of this court that there was no error committed by the trial court in permitting the defendant to be cross-examined as to his former conviction of murder: (1) Because it was proper to affect his credibility as a witness; (2) because it was a matter about which he had voluntarily testified in his examination in chief; (3) because the status of the defendant as a prisoner in the state penitentiary was a proper subject-matter of inquiry in this case independent of the fact that he became a witness in his own behalf.

It is also contended that the court permitted the county attorney to make certain prejudicial remarks in his closing argument. We have carefully examined the record with relation to these remarks, a great part of the closing argument of the county attorney being embodied in the case-made. The argument complained of related to the question of punishment to be inflicted, and the county attorney in effect argued that the defendant, having once been convicted of murder and given the death penalty, which was commuted to life, was a hardened criminal, that the fact that he was then serving a life sentence had not been a deterrent for the commission of this crime, and that if the death penalty were not inflicted his natural inclination to murder would probably assert itself in the future. We think these inferences were properly deducible from the evidence in this case. This was a case either of murder or justifiable homicide, and the issue of fact having been decided by the jury against this defendant, we assume as true the evidence on the part of the state which disclosed a deliberate, willful, and premeditated homicide, and no intelligent or honest jury, under the circumstances disclosed

by this record, would have been justified in returning a verdict assessing less than the most extreme penalty of the law.

This defendant is not unknown to this court. His criminal conduct already forms a part of the legal history of Oklahoma. See *Opinion of the Judges,* 6 Okla. Cr. 18, 115 Pac. 1028; also *Holmes v. State,* 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300. In the former case it was said of one of his previous crimes:

"Upon a careful examination of the record we find that the information sufficiently and correctly charges the crime of murder. The defendant had the benefit of counsel, and the record shows that said defendant made a voluntary written confession which details the facts of the murder of W. H. Archer, as charged in the information, wherein defendant states that after he and his codefendants robbed said Archer, he, the defendant, with a 44-caliber revolver, shot him. The record further shows that this defendant, being called as a witness on the trial of his codefendants, and being first duly sworn, testified that he held the revolver in his hand when it was discharged. On cross-examination he stated that he had been convicted of a felony and served a term of imprisonment in the penitentiary. * * * The record shows that the defendant, John Henry Prather, is guilty of a wanton and deliberate murder. It would seem that never was a murderer more guilty. All good citizens must acknowledge the justice of the penalty of the law in such a case. We are of opinion that the defendant, John Henry Prather, has been adjudged to suffer the just penalty of the law in the manner prescribed by law, and upon his trial the formalities of law essential to the taking of human life have been fully observed."

It is also contended that the trial court erred in overruling the defendant's motion for a new trial. Under this

assignment it is contended that the verdict of the jury is
not sustained by the evidence. There appears to be no
merit in this contention. While the evidence is conflicting,
we cannot sustain this contention. We do not mean to
say that the evidence demanded a finding of the particular
facts which the jury found were true; but, in dealing with
the question of whether or not there is sufficient evidence
to support a verdict, we are constrained to treat as duly
established all facts warranted by the testimony of the
witnesses for the state, and to give the prevailing side the
benefit of every inference favorable to it which is fairly
and legitimately deducible from those facts. This is the
course heretofore pursued by this court. *Davis v. State,*
10 Okla. Cr. 169, 135 Pac. 438; *Calvert v. State,* 10 Okla.
Cr. 185, 135 Pac. 737; *Maggard v. State,* 9 Okla. Cr. 236,.
131 Pac. 549; *Stephens v. State,* 12 Okla. Cr. 90, 152 Pac.
138; *Flowers v. State,* 12 Okla. Cr. 320, 155 Pac. 904.

This is a capital case, and for that reason the court
has been painstaking, not only in examining the conten-
tions of counsel for defendant, but also it has given the en-
tire record a very careful perusal. The instructions of
the court were fair to the defendant, and nowhere is it
disclosed in the entire proceeding that any matter which
affected the substantial rights of this defendant to his
prejudice was permitted to occur. This defendant has
twice faced a jury of his peers for the taking of human
life; the first time for the killing of a member of the white
race, this time for the killing of a member of his own race.
In both instances the verdict of the jury has been that
he should suffer death. The mercy of the Governor in the
first instance had no effect to reform or restrain him, and
although confined within the walls of the state's prison,
and under the eyes of the guards thereof, he was, by rea-

son of his cunning, able to slay. his cell-mate as the latter returned from his day's labor in the dusk of the evening, unsuspecting and unarmed.

The judgment of conviction, assessing the death penalty, is affirmed, and the warden of the state penitentiary at McAlester is hereby ordered and directed to carry into effect against this defendant the judgment and sentence of the district court of Pittsburg county that he suffer death; said penalty to be executed on the 3d day of May, 1918, in the manner provided by the laws of this state.

DOYLE, P. J., and ARMSTRONG, J., concur.